UNITED STATES of America

v.

Darrel A. WESTON, Staff Sergeant
(E–6), U.S. Marine Corps.

NMCCA 200600985.

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 22 Dec. 2005.

25 Sept. 2007.

For Appellant: Maj Richard Belliss, USMC.

For Appellee: Capt Geoffrey Shows, USMC.

Before ROLPH and HARTY, Senior Judges, and KELLY, Appellate Military Judge.

## PUBLISHED OPINION OF THE COURT

HARTY, Senior Judge:

A general court-martial, composed of officer members, convicted the appellant, contrary to his pleas, of housebreaking and two specifications of service discrediting conduct by invading the privacy of another, in violation of Articles 130 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 930 and 934. The appellant was sentenced to confinement for seven months, total forfeiture of pay and allowances, reduction to pay grade E–1, and a dishonorable discharge. The convening authority approved the sentence as adjudged.

We have considered the record of trial, the appellant's six assignments of error, the appellant's response to this court's four specified issues, the Government's Answers, the appellant's Reply, and the parties' excellent oral arguments. We find merit in the appellant's first assignment of error challenging the Government's consent search in light of *Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), and we will take corrective action in our decretal paragraph by setting aside the findings and sen-

tence and authorizing a rehearing. Because of our action, the remaining issues are moot.

## Background

The appellant was the head court reporter at the Marine Corps Base, Kaneohe Bay, Hawaii, Law Center. The victim, Sergeant (Sgt) E, was the appellant's subordinate in the court reporting shop where they worked closely together. Over time, the appellant developed more than a professional interest in the victim, but that interest was not mutually shared by the victim.

Unable to fulfill the desires he held for the victim, the appellant placed a micro surveillance camera in a hollowed-out electric razor and placed the razor in the bathroom shared by the appellant, the victim, and a military judge. The camera was powered by batteries and transmitted a constant live video signal to a receiver attached to a video cassette recorder (VCR)[1] located on the appellant's desk, a few feet from the shared bathroom. The transmitted images were recorded onto a VHS-format video tape in the VCR and later transferred to a computer hard drive.[2]

On 18 May 2004, the victim noticed an electric razor in the shared bathroom and remembered that she had seen what she believed to be the same razor on other occasions, and that the razor was always pointed toward the toilet or where her vaginal area would be when she was standing. She inspected the razor and found that it was not functional, the power plug was missing, and the razor was very light. The victim opened the razor and discovered a micro surveillance camera pointing out where the power plug should have been.

The victim turned the razor over to the Criminal Investigations Division (CID) and gave an oral statement the same day. Based on the information provided by the victim, CID sent a military policeman (MP) to the appellant's on-base residence where the MP informed the appellant's wife that CID would like the appellant to come in for an interview.

The appellant and his wife drove to CID together where they were separated and placed in different interview rooms.

CID agent Crystal Stevenson asked the appellant for consent to search his residence, however, the appellant refused. Agent Stevenson then went to the appellant's wife, who was still at CID, and obtained her consent to search the family residence without informing her that her husband had just refused consent. Once Agent Stevenson had the appellant's wife's written consent to search, she ordered the appellant held in custody at CID and the appellant's cellular phone was confiscated when it was discovered that he had used it to speak with an attorney. During the search, CID seized two computers and multiple media storage devices.

Twenty-nine days after the seizure, CID obtained written authorization from the commanding general to search the appellant's personal computer. A forensic laboratory searched the appellant's computer and retrieved 31 deleted videos and still images of Sgt E in various states of undress while changing clothes, changing female sanitary products, urinating, and defecating in the shared bathroom at the Law Center. It also retrieved three deleted images photographed from inside the victim's residence.

## Competing Consents

For his first assignment of error, the appellant claims that the consent search was unreasonable as to him in light of *Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). Appellant's Brief and Assignments of Error of 11 Sep 2006 at 5. The Government asserts that *Randolph* does not apply because the appellant was not physically present at the physical threshold of the residence when he denied consent. Government Answer of 23 Oct 2006 at 4.

At trial, the appellant attacked the reasonableness of the search by challenging the voluntariness of his wife's consent. The issue was litigated and the military judge is-

---

1. The receiver was attached to an adapter used to connect the receiver to the VCR.

2. The appellant also entered the victim's on-base residence without her consent when the victim's

son was staying with the appellant's family and took still photographs of the victim's underwear drawer in her bedroom and the shower head in the bathroom.

sued findings of fact and conclusions of law concluding that the wife's consent was not coerced and therefore was voluntary. Appellate Exhibit XXV. The issue of competing consents, however, was never litigated and, therefore, the military judge did not make findings and conclusions on that specific legal theory.[3] The findings of fact made are, however, relevant to the resolution of the issue raised on appeal, and the military judge did conclude that even if the consent was not valid, the evidence would have been inevitably discovered. *See* AE XXV at 11.

The appellant does not challenge the military judge's findings of fact. The appellant does, however, challenge the military judge's conclusion of law that the consent search was reasonable as to the appellant, claiming that a finding of consent based on an incorrect legal test is an abuse of discretion, citing *United States v. Vassar*, 52 M.J. 9, 12 (C.A.A.F.1999). Appellant's Brief at 5. The appellant also asserts, in response to our specified issues, that the facts do not warrant application of the inevitable discovery exception to the exclusionary rule, however, he does not mention the military judge's conclusion on this important issue. Appellant's Brief on Court–Ordered Assignments of Error of 8 May 2007 at 3.

"A military judge's decision to admit or exclude evidence is reviewed for an abuse of discretion." *United States v. Seay*, 60 M.J. 73, 77 (C.A.A.F.2004)(quoting *United States v. McCollum*, 58 M.J. 323, 335 (C.A.A.F.2003)(internal quotation marks omitted)). "A military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *Id.* (quoting *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F.2004)(internal quotation marks omitted)). "[I]n reviewing a ruling on a motion to suppress, we consider the evidence in the light most favorable to the prevailing party." *United States v. Leedy*, 65 M.J. 208, 213 (C.A.A.F.2007)(quoting *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F.1996)(in-

ternal quotation marks omitted)). Judicial determinations that the "inevitable discovery" doctrine applies are reviewed using the same abuse of discretion standard where the issue is litigated at trial. *See United States v. Kaliski*, 37 M.J. 105, 109 (C.M.A.1993)(holding that an abuse of discretion standard is applied where inevitable discovery is litigated at trial, otherwise the issue is reviewed *de novo*). Because the Government asserted inevitable discovery in its written response to the appellant's motion to suppress and argued inevitable discovery, we consider the issue to have been litigated at trial, triggering an abuse of discretion standard of review, even though the Government did not present any evidence on this issue.

Here, the military judge's findings of fact are supported by the record and are, therefore, not clearly erroneous. We adopt those findings as our own and will invoke our authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to supplement those facts from the record in order to resolve the issues before us. The military judge did not consider the law of competing consents in resolving the issue as presented to him, however, given the fact that the appellant challenged the consent search as unreasonable based, in part, on CID's failure to disclose his consent refusal to his spouse before obtaining her consent, the issue of reasonableness based on competing consents was before the court.

1. The law of competing consents

 The Fourth Amendment to the United States Constitution mandates that "the right of the people to be secure ... against unreasonable searches and seizures, shall not be violated." "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnotes omitted). One of those well-delineated exceptions is where a third party who possesses common authority

---

**3.** Counsel and the military judge did not have the benefit of the U.S. Supreme Court's analysis in *Randolph* at the time of trial.

over the premises consents to the search. *See Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *see also United States v. Rader*, 65 M.J. 30, 30–31 (C.A.A.F.2007)(citing *Matlock*, 415 U.S. at 170–71, 94 S.Ct. 988). We must decide whether the consent search conducted in this case is reasonable as to the appellant who refused consent but did so when he was not physically present at the residence.

In *Randolph*, the Supreme Court resolved a split of authority concerning whether a co-tenant has authority to consent to a warrantless search over the express refusal of a present and non-consenting co-tenant. *Randolph*, 547 U.S. at 108, 126 S.Ct. 1515. The Court concluded that "a warrantless search of a shared dwelling for evidence *over the express refusal of consent by a physically present resident* cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 120, 126 S.Ct. 1515 (emphasis added). Here, the Government relies on a narrow interpretation of *Randolph*, arguing that it must be limited to competing consents involving an accused who is physically present at the residential physical threshold. During oral argument, however, the Government conceded that the concept of "threshold" and "physically present" may extend to include the residential curtilage. We will analyze the Supreme Court's *Randolph* decision to determine whether the concepts of "physically present" and "residential threshold" are limited to the front door, or whether the *Randolph* analysis is equally applicable to a consent refusal communicated away from the front door.

In *Randolph*, the accused's spouse called police to the family home where she advised them that her husband was a cocaine user and that evidence of that use was in the residence. Mr. Randolph, who was physical-ly present at the home, refused consent to search the residence. Mrs. Randolph then not only consented, but also escorted law enforcement to her husband's bedroom where a straw with suspected cocaine residue was located. *Id.* at 108, 126 S.Ct. 1515. Mr. Randolph moved to suppress the product of the warrantless search as being unauthorized by his wife's consent over his express refusal. His motion was denied at trial but the Court of Appeals of Georgia reversed the trial court, and the Georgia Supreme Court affirmed the Court of Appeals, both holding that a consenting co-tenant cannot override a physically present co-tenant's express refusal. *Id.*

The U.S. Supreme Court granted *certiorari* in *Randolph* to resolve a split of authority between federal and state courts in how to apply the co-occupant consent rule expressed in *Matlock*.[4] *Id.* In *Matlock*, the accused was arrested in the front yard of his shared residence and placed in a police vehicle parked nearby while law enforcement officers asked a co-tenant for permission to search the shared residence. Consent was granted and Matlock was not asked for consent even though he could easily have been consulted. *Matlock*, 415 U.S. at 166, 94 S.Ct. 988. In affirming the consent search, the Supreme Court held that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.* at 170, 94 S.Ct. 988. The Court determined that the authority to provide valid consent rested on the reasonable recognition, flowing from the "mutual use of the property by persons generally having joint access or control for most purposes," that any "co-inhabitant[ ] has the right to permit the inspection in his own right and that the others have *assumed the risk* that one of their number might permit the common area to be searched." *Id.* at 171 n. 7, 94 S.Ct. 988 (emphasis added).[5]

4. The majority of federal and state courts concluded that a valid consent remains effective even when a co-inhabitant expressly objects to the search. *Randolph*, 547 U.S. at 108 n. 1, 126 S.Ct. 1515.

5. Some courts subsequently gave *Matlock's* assumption of risk language controlling weight in resolving co-occupant consent issues resulting in rulings that upheld consent searches even when the accused was present and refused consent. *See, e.g., United States v. Morning*, 64 F.3d 531, 533–36 (9th Cir.1995).

In *Randolph*, the Supreme Court explained that its holding in *Matlock* was based on "widely shared social expectations" and "commonly held understanding[s]" about co-tenant rights and relationships upon which law enforcement may rely. *Randolph*, 547 U.S. at 111, 126 S.Ct. 1515. As an example of shared social expectations and common understanding, the Supreme Court provided that a person at the front door of a shared residence "would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.' Without some very good reason, no sensible person would go inside under those conditions." *Id.* at 113, 126 S.Ct. 1515. If the co-tenant is not present to say "stay out," there is no shared social expectation or common understanding that would cause the person at the front door, absent more,[6] to question the reasonableness of his entry at the present co-tenant's invitation. Accordingly, a co-tenant who is not present only assumes the risk that in his absence, another co-tenant may invite someone into the residence without his prior approval. *Id.* at 111, 126 S.Ct. 1515.

Because a co-tenant who wishes to invite a third party into the shared residence "has no recognized authority in law or social practice to prevail over a present and objecting co-tenant," the Supreme Court held that such an invitation, on balance, gives law enforcement "no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Id.* at 114, 126 S.Ct. 1515. That is because the consenting individual's interest in inviting law enforcement into the shared residence, combined with the Government's interests, do not outweigh "the force of an objecting individual's claim to security against the government's intrusion into his dwelling place." *Id.* at 115, 126 S.Ct. 1515.

In weighing these competing interests, the Supreme Court concluded that the consenting co-tenant's interest in reporting crime and the Government's interest in preventing crime can be protected without overriding the non-consenting co-tenant's constitutional right to be free from warrantless intrusions into his home. For example, a co-tenant can, individually, retrieve evidence of a crime from the shared residence and deliver it to law enforcement. *See Coolidge v. N.H.*, 403 U.S. 443, 488, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)(accused's spouse retrieved guns from the family residence and delivered them to law enforcement). A co-tenant can also provide information upon which a warrant is obtained. *See Illinois v. McArthur*, 531 U.S. 326, 331, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001)(accused's spouse told law enforcement that she saw the accused hide drugs under the furniture, resulting in law enforcement seizing the residence while they obtained a warrant). In each example, the consenting co-tenant's interest in reporting crime and the Government's interest in preventing that crime are fulfilled without violating the non-consenting co-tenant's right against warrantless Governmental intrusions.

It was against this foundation of shared social expectations and common understanding of co-tenant rights and relationships, and the weighing and balancing of competing interests, that the Supreme Court concluded that "nothing in social custom or its reflection in private law argues for placing a higher value on delving into private premises to search for evidence in the face of disputed consent, than on requiring clear justification before the government searches private living quarters over a resident's objection." *Randolph*, 547 U.S. at 120, 126 S.Ct. 1515. Expressing its holding narrowly to the facts before it, the Supreme Court held "that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis

---

**6.** "Unless the people living together fall within some recognized hierarchy, like a household of parent and child or barracks housing military personnel of different grades, there is no societal understanding of superior and inferior, a fact reflected in a standard formulation of domestic property law, that '[e]ach cotenant ... has the right to use and enjoy the entire property as if he or she were the sole owner, limited only by the same right in the other cotenants.'" *Randolph*, 547 U.S. at 114, 126 S.Ct. 1515 (quoting 7 R. POWELL, POWELL ON REAL PROPERTY § 50.03[1], p 50–14 (M. Wolf gen. ed.2005)).

of consent given to the police by another resident." *Id.* (footnote omitted).

## 2. Competing consent analysis

*Matlock* dealt with an accused who was near his residence but was not asked whether or not he consented to the search of his residence, while a co-tenant gave consent. *Randolph* dealt with co-tenants who were both physically present at their residence, and both were asked for consent to search, resulting in competing consents. The appellant's facts fall in the middle ground between *Matlock* and *Randolph*—neither co-tenant was present at the residence but both were asked for consent to search, resulting in competing consents. Applying the *Randolph* analysis here, based on shared social expectations and common understanding of co-tenant rights and relationships, and weighing and balancing the competing interests, we conclude that the consent colloquy in this case, held away from the residential front door and resulting in competing consents, is constitutionally no different than one held at the physical residential front door.

Although we can distinguish the present facts from those in *Randolph*, we do not find those differences constitutionally significant. Of greatest concern is whether the shared social expectations and common understanding of a person at the physical residential threshold would be the same as someone who was not at the front door when competing invitations to enter are communicated. Would a sensible person who is presented with competing invitations away from the shared residence have any confidence that the "invitation was a sufficiently good reason to enter when a fellow tenant" told them to stay out? *Randolph*, 547 U.S. at 113, 126 S.Ct. 1515. If the invitee knew that the non-consenting co-tenant would not or could not be present at the shared residence to enforce his refusal, would shared social expectations and common understanding lead a sensible person to have confidence that the competing invitation is a sufficient reason to enter? We think not.

We consider the appellant to have been "present" and "objecting" for the purpose of applying *Randolph*. Because the appellant's spouse "has no recognized authority in law or social practice to prevail over a present and objecting co-tenant," her consent gave CID "no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Id.* at 114, 126 S.Ct. 1515. This is true not only based on the concepts of shared social expectations and common understanding applied to co-tenants, but by weighing and balancing the competing interests involved.

Mrs. Weston's interest in reporting her husband's criminal activity and the Government's interest in preventing or prosecuting that activity, do not outweigh the appellant's right to be free from unreasonable searches of his residence—a right firmly rooted in the "centuries-old principle of respect for the privacy of the home." *Id.* at 115, 126 S.Ct. 1515 (quoting *Wilson v. Layne*, 526 U.S. 603, 610, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)(internal quotations omitted)). While obtaining access to a residence by consent is much easier and more expedient than by obtaining a warrant, "[a] generalized interest in expedient law enforcement cannot, without more, justify a warrantless search." *Id.* at 116, n. 5, 126 S.Ct. 1515 (citation omitted). On balance, the competing interests present here are no match for the "central value of the Fourth Amendment, and the [Government's] other countervailing claims do not add up to outweigh it." *Id.* at 115, 126 S.Ct. 1515. Accordingly, we conclude that the warrantless search of the appellant's residence was not reasonable as to him on the basis of the competing consent given by his spouse.[7] Although we find constitutional error, that does not mean the fruits of that error must be suppressed.

## A. Exclusionary Rule

The Fourth Amendment does not provide for the exclusion of evidence obtained in vio-

---

7. We do not, by our ruling here, seek to establish a bright line rule that can be applied beyond the facts in this case. Rather, we decide the case before us and no others. *See Randolph*, 547 U.S. at 120 n. 8, 126 S.Ct. 1515 ("We decide the case before us, not a different one."). Therefore, we reserve for another day resolution of other fact patterns.

lation of that amendment's provisions. *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (quoting *United States v. Calandra*, 414 U.S. 338, 354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The concept of excluding evidence obtained in violation of the Fourth Amendment, the exclusionary rule, is purely a judicially-created sanction, *Hudson v. Michigan*, 547 U.S. 586, 126 S.Ct. 2159, 2163, 165 L.Ed.2d 56 (2006)(citing *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914)), designed to deter future "police conduct that violates Fourth Amendment rights." *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Despite the exclusionary rule's broad purpose, "the rule does not proscribe the introduction of illegally seized evidence in all proceedings or against all persons ... but applies only in contexts where its remedial objectives are thought most efficaciously served." *Penn. Board of Probation and Parole v. Scott*, 524 U.S. 357, 363, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998)(quoting *Powell*, 428 U.S. at 486, 96 S.Ct. 3037, and *Calandra*, 414 U.S. at 348, 94 S.Ct. 613)(internal quotation marks omitted).

The U.S. Supreme Court has consistently instructed lower courts to proceed with caution when employing the exclusionary rule because it "deflects the truthfinding process" by denying factfinders access to relevant and probative evidence, and "if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice." *Powell*, 428 U.S. at 490–91, 96 S.Ct. 3037 (footnote omitted). In order to determine whether the exclusionary rule should be applied, we must strike a balance between "the public interest in deter-mination of truth at trial" and the "incremental contribution that might [be] made to the protection of Fourth Amendment values." *Id.* at 488, 96 S.Ct. 3037. Because the application of the exclusionary rule requires the balancing of these interests, it is not applied in a knee-jerk reaction simply because a constitutional violation is the "but-for" cause of obtaining the evidence sought to be excluded. *Hudson*, 126 S.Ct. at 2164 (quoting *Segura v. United States*, 468 U.S. 796, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)); *see Illinois v. Gates*, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)(holding that application of the exclusionary rule is a separate question from whether the Fourth Amendment has been violated). Therefore, the suppression of evidence should be "our last resort, not our first impulse." *Hudson*, 126 S.Ct. at 2163.

Although the search in this case violated the appellant's Fourth Amendment protection against unreasonable searches and is the direct causation for the discovery of the seized evidence, we must decide whether the remedial objective of exclusion—the future deterrence of police conduct that violates Fourth Amendment rights—outweighs the social cost that will result from that exclusion. This required analysis has resulted in judicially-created exceptions to the exclusionary rule.

**B. Exceptions to the exclusionary rule**

The Supreme Court recognizes several exceptions to the exclusionary rule that logically flow from the analytical balancing of interests that the exclusionary rule requires. These exceptions include the independent source doctrine,[8] the attenuation doctrine,[9]

---

8. The independent source doctrine stems from *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), where several law enforcement agents conducted an illegal search of a warehouse and observed, but did not seize, evidence that was in plain view. The agents later obtained a warrant without mentioning the prior illegal entry or relying on any observations made during the prior entry. In execution of the warrant, the agents then seized the evidence they had observed earlier. The Supreme Court held that suppression of the evidence was not required if the Government could establish that the warrant was in fact a genuinely independent source for its discovery.

9. Attenuation occurs when the causal connection between the constitutional violation and the discovery of evidence is remote, *Hudson*, 126 S.Ct. at 2164 (citing *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)); but even where there is a direct causal connection between the constitutional violation and the discovery of evidence, attenuation will occur when "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Id.*

the good faith exception,[10] and the inevitable discovery rule.[11] Of these exceptions, only inevitable discovery is at issue here.

### 1) Inevitable discovery rule

In *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the Supreme Court determined that if evidence is obtained in violation of the Fourth Amendment, it may still be introduced at trial "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444, 104 S.Ct. 2501. The Government may meet this burden by presenting evidence that a prior or parallel investigation was already underway that would have discovered the tainted evidence independent of a later or simultaneous Government illegal act. In *Nix*, the Government presented evidence of the extensive grid search that was being conducted at the time the accused identified the location where he disposed of his murder victim's body. The Government witness testified that if the body's location had not been revealed, the grid search would have continued into the county in which the body was located and that the searchers were instructed to inspect all culverts; the victim's body was located in a culvert. The Supreme Court held that the Government's evidence was sufficient to establish by a preponderance of the evidence that the victim's body would have been located by the ongoing search even if the accused's statement had not been illegally obtained. *Id.* at 448–50, 104 S.Ct. 2501.

Even if there is no ongoing or parallel investigation, the Government may carry its burden by presenting evidence that the procedures routinely followed by that law enforcement agency, here CID at Marine Corps Base, Kaneohe Bay, under the same circumstances would have uncovered the evidence even without the illegality. For example, in *United States v. Haro–Salcedo*, 107 F.3d 769, 773 (10th Cir.1997), the court held that cocaine evidence obtained from an unlawful search of an automobile was admissible because the police showed that the evidence would have been inevitably discovered in the inventory search of the automobile which that agency always conducts following a vehicle impoundment. Similarly, in *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir.1995), the court held that cocaine in a misrouted suitcase would have been inevitably discovered based on evidence that the airline conducts a routine search of misrouted luggage for identification of the suitcase's owner. Even before the Supreme Court adopted the inevitable discovery rule in *Nix*, then-Judge Warren Burger, in *Wayne v. United States*, 318 F.2d 205 (D.C.Cir.1963), justified the admission of a coroner's autopsy testimony where the dead body was discovered through an illegal search. There, the Government's evidence established that the coroner would sooner or later have conducted the autopsy because the decedent's body would have eventually been discovered, local law enforcement procedure required the police to contact the coroner after locating a dead body, and local law required the coroner to perform an autopsy under the circumstances in that case. *Id.* at 209. *Accord United States v. Owens*, 51 M.J. 204, 210–211 (C.A.A.F.1999)("When the routine procedures of a law enforcement agency would inevitably find the same evidence, the rule of inevitable discovery applies even in the absence of a prior or parallel investigation.")(citing *Kennedy*, 61 F.3d 494).

We test judicial determinations that the inevitable discovery doctrine applies for an abuse of discretion. *Kaliski*, 37 M.J. at 109. "Inevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment

---

10. The good faith exception is based on the attenuation between the execution of a defective search warrant with the good faith belief that it is valid and the future deterrence benefit of excluding the evidence obtained in the process. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405 (1984).

11. Our superior court adopted the inevitable discovery exception to the exclusionary rule in *United States v. Kozak*, 12 M.J. 389, 394 (C.M.A. 1982), and it was incorporated into the MANUAL FOR COURTS-MARTIAL in 1986. *See* MILITARY RULE OF EVIDENCE 311(b)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.); *see also* MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.), App. 22, at A22–17.

and the exclusionary rule, courts must take care to hold the government to its burden of proof." *United States v. Jones*, 72 F.3d 1324, 1334 (7th Cir.1995) (citations omitted). Therefore, proof of inevitable discovery does not involve speculative elements. *Id.* ("Speculation and assumption do not satisfy the dictates of Nix.")(citing *United States v. Brown*, 64 F.3d 1083, 1091 (7th Cir.1995))(Rovner, J., dissenting). Rather, it focuses on "demonstrated historical facts capable of ready verification or impeachment" and "requires the [trial] court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *Kennedy*, 61 F.3d at 498 (quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir.1992)(internal quotation marks omitted)). This requires a military judge to determine what would have happened "in light of what the government knew and was pursuing at the moment before the unlawful search, and *other relevant facts and circumstances.*" *Eng*, 971 F.2d at 862 (emphasis added).

Other relevant facts and circumstances can include whether the agency involved follows a specific protocol in the same situation or whether the officer involved, by habit or routine, follows a specific set of procedures under the same circumstances. These other relevant facts and circumstances, however, must be a matter of record presented as evidence. It may not be enough for a Government witness to merely state what he would have done absent the prior illegal action. *See United States v. Heath*, 455 F.3d 52, 62 n. 12 (2d Cir.2006)("The question is whether an officer would have 'inevitably' acted in a certain way, and that inquiry remains an objective one, not necessarily turning on an officer's own testimony as to what he believes he would have done.").

12. "What a man *could* do is not at all the same as what he *would* do." *Hudson*, 126 S.Ct. at 2178 (Breyer, J., dissenting)(quoting Austin, Ifs and Cans, 42 Proceedings of the British Academy 109, 111–12 (1956)(emphasis in original, internal quotations omitted)).

13. Even if search authorization is subsequently obtained, the inevitable discovery exception should not be invoked where that authorization was obtained, in part, with information gained as

The emphasis in an inevitable discovery analysis is on what *would* have happened rather than what *could* or *might* have happened, *United States v. Namer*, 835 F.2d 1084, 1088 (5th Cir.1988) (citations omitted), without speculation.[12] *Nix*, 467 U.S. at 444 n. 5, 104 S.Ct. 2501. It is, therefore, not sufficient to merely show that the facts known prior to the illegal act establish probable cause to obtain search authorization or that there were other legal means that could have been used to obtain the evidence.[13] *See United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir.2000)("What makes a discovery 'inevitable' is not probable cause alone ... but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search.")(quoting *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir.1995)(internal quotations omitted)); *see also United States v. Mejia*, 69 F.3d 309, 320 (9th Cir.1995)("This court has never applied the inevitable discovery exception so as to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant."). *But cf. United States v. Rittenhouse*, 62 M.J. 509, 514 (Army Ct. Crim.App.2005)(in dicta indicating that having probable cause alone is sufficient to establish inevitable discovery, because seeking search authorization based on probable cause is a routine law enforcement procedure).

To hold that probable cause alone is sufficient to establish inevitable discovery would relieve the Government of its burden to establish the exception by a preponderance of the evidence, allow the exception to consume the exclusionary rule, and make the warrant requirement unnecessary. *See Mejia*, 69 F.3d at 320 ("To apply the inevitable discovery doctrine whenever the police could have obtained a warrant but chose not to would in effect eliminate the warrant requirement.");

a result of the illegal search. *See United States v. Rhiger*, 315 F.3d 1283, 1294–95 (10th Cir. 2003)("The inevitable discovery doctrine should not apply if ... information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.")(quoting *Murray v. United States*, 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)). Such is the case here.

*United States v. Johnson*, 22 F.3d 674, 683 (6th Cir.1994) ("[T]o hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause.").

2) Inevitable discovery analysis

■ Here, the Government presented evidence that CID was in the process of investigating the victim's allegations when it obtained consent to search the appellant's residence. According to CID Special Agent (SA) Jason Grimes, CID began the investigation by interviewing the victim for approximately one hour. During that interview, the victim, Sgt E, provided CID with the electric razor she took from the shared bathroom at the Law Center and the micro surveillance camera that was still inside that razor. Sgt E also informed CID that before coming to CID, she told the appellant's wife that she suspected the appellant of watching her in the bathroom, and recommended that she not allow him to go into the family computer room. She also shared Mrs. Weston's response that the appellant had already been home and spent approximately one hour in the computer room. After Sgt E's conversation with Mrs. Weston, Sgt E began receiving calls from the appellant on her cellular telephone. The victim also revealed that the appellant had an extensive knowledge of computers, and had previously shown her micro surveillance cameras at his residence.

When the appellant and his wife arrived at CID, Mrs. Weston turned over a receiver, adaptor, and an electric razor to CID. Mrs. Weston explained that they do have a razor with a micro surveillance camera hidden inside, however, she found the receiver and adaptor that are necessary to operate that camera at the shared Weston residence and, therefore, she concluded that the wrong razor was taken to the Law Center. SA

Grimes determined, based on his admitted limited knowledge of technology, that the adapter provided by Mrs. Weston ran from the camera's receiver to a VCR, and he concluded that the images would then be downloaded to a computer. Based on the fact that the appellant had been in the family computer room for one hour earlier that day, SA Grimes concluded that the appellant either had tampered with the computer or the evidence was still on the computer. Following the residential search, SA Grimes obtained written search authorization for the appellant's computer.[14] It took him 29 days to obtain that authorization because: (1) he had never obtained search authorization before; (2) the trial counsel, military justice officer, and the staff judge advocate (SJA) were all in transition and unavailable to assist him; (3) it took him six drafts to get his affidavit language correct; and, (4) six appointments with the commanding general were rescheduled. There was no evidence that CID was in the process of seeking search authorization prior to obtaining Mrs. Weston's consent.

The Government asks this court to assume that CID would have obtained authorization to search the appellant's residence and to seize his computer if consent had been denied because there was probable cause to believe evidence of a crime would be found on the appellant's computer. Therefore, the evidence would have been inevitably discovered by simply following standard search authorization procedures. Although the Government relied on inevitable discovery in its written response to the appellant's written motion at trial, AE IV at 13, and argued inevitable discovery as an alternative theory for denying the appellant's motion, Record at 153, it did not present any evidence to support that theory. Only the cross-examination of SA Grimes provides any insight into any "demonstrated historical facts capable of ready verification or impeachment."

14. The search application affidavit relies, in heavy part, on evidence obtained during the search and evidence obtained later as a result of the search, including an argument that probable cause existed to believe that evidence was on the computer because a warrantless search of the other seized storage media did not turn up any evidence of a crime. Sworn Affidavit for Search Authorization of 16 Jun 2004. For this reason, the independent source exception to the exclusionary rule does not apply. *See Murray*, 487 U.S. at 535, 108 S.Ct. 2529.

SA Grimes testified that he knew how to get a warrant, that it had to be based on probable cause, that it had to be issued by a person authorized to grant search authorization, and that the SJA would identify that person. However, he had never applied for search authorization before, he did not know how to draft a search authorization affidavit, and the SJA was not available to inform him where to take the affidavit. *Id.* at 51–52. This lack of knowledge is also evidenced by SA Grimes' testimony that it took him six drafts before the search affidavit was in satisfactory condition to present to an authorizing official. *Id.*

We could speculate that SA Grimes would have completed his search affidavit faster if consent was denied, or that someone would have advised him that authorization can be based on sworn oral statements given directly to the authorizing official. *See* MIL. R. EVID. 315(f)(2)(B). However, we would also have to speculate as to who that would be. Apparently, it would not be the trial counsel, military justice officer, or the SJA, because all of those people were not available to assist in the search authorization process.[15] We could also speculate that CID would have seized the residence while it obtained search authorization following the procedures approved in *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001), however, we would still have to speculate that CID was aware of this procedure and could have obtained search authorization within a reasonable time. We could also speculate that CID, like any competent law enforcement agency, routinely followed a set protocol under like circumstances that would have lead to the discovery of the evidence at issue.

The evidence presented, however, shows an inexperienced SA who did not know how to draft a search authorization affidavit, did not possess knowledge of alternative procedures to lawfully obtain evidence, and did not have the supervision of others who were aware of these procedures that "would" have resulted in the seizure of the appellant's computer. The record is also devoid of evidence

that CID was in the process of obtaining search authorization or what standard operating procedures CID followed. At best, the evidence shows that there may have been probable cause upon which search authorization may have been granted that "could" have or "might" have resulted in the inevitable discovery of the evidence found on the appellant's computer if search authorization had been sought. But even this does not end the appellate speculation required to find an inevitable discovery exception to the exclusionary rule in this case.

The Government argues that the evidence would still be on the appellant's computer when search authorization would have been finally obtained. There is legal authority for such a proposition. "A tangible object is hard evidence, and absent its removal will remain where left until discovered." *United States v. De Reyes*, 149 F.3d 192, 196 (3d Cir.1998). However, the Government argues there was probable cause to believe evidence was on the appellant's computer, in part, because of the appellant's "extensive knowledge of computers." Record at 38. On the other hand, the Government wants this court to speculate that the appellant was not computer literate enough to remove the computer's hard drive. The Government's evidence, however, shows that the appellant's computer room contained many partial computer systems. *Id.* at 42, 45. If we could speculate, it would be more reasonable to speculate that the appellant would have used his computer expertise to remove the computer's hard drive, thereby creating just another partial computer system.

Applying the law of inevitable discovery to the facts in this case leads us to the conclusion that the Government's evidence establishes no more than that the seized evidence "could" have been discovered if an alternative procedure had been implemented as part of the investigation. Only speculation can get the Government beyond what "could" have been done and what results "might" have been achieved. Because we must focus

---

**15.** We note, however, that Staff Sergeant Gasper, USMC, of CID was able to communicate with the trial counsel twice during the evening that CID searched the appellant's home, Record at 71 and

75, and that trial counsel was available a few days later to participate in a test demonstration of the camera system at the Law Center. *Id.* at 402.

on the "demonstrated historical facts capable of ready verification or impeachment," without speculation, *Nix*, 467 U.S. at 444 n. 5, 104 S.Ct. 2501, we conclude that the Government did not carry its burden of establishing inevitable discovery by a preponderance of the evidence. Accordingly, we find that the military judge abused his discretion in concluding that the seized evidence would have been inevitably discovered merely because CID had a legal basis upon which search authorization could be sought—probable cause.[16] AE XXV at 11.

## Conclusion

Accordingly, we conclude that the search of the appellant's residence was unreasonable as to him, and that the exclusionary rule's remedial objectives outweigh "its substantial social costs" in this case. *See Hudson*, 126 S.Ct. at 2163. The evidence seized from the appellant's residence should have been suppressed. Therefore, the findings and sentence are set aside. A rehearing is authorized.

Senior Judge ROLPH and Judge KELLY concur.

---

**16.** We encourage all military judges to make findings of fact based on the evidence presented that identify the investigative procedures that were already underway prior to the illegal act as in *Nix*, or the standard operating procedures that would have been employed, the regulatory requirements that would have been followed, or the officer's habit or routine under similar circumstances such as in *Haro–Salcedo*, *Kennedy* and *Wayne*. Any conclusion that the evidence would have been ultimately or inevitably discovered must be based on those facts.