**UNITED STATES, Appellee,**

v.

**Private (E–2) Mark D. FOSTER, SSN 403–92–1660, United States Army, Appellant.**

**CM 440659.**

U. S. Army Court of Military Review.

13 May 1982.

---

Captain Gary D. Gray, JAGC, argued the cause for the appellant. With him on the brief were Colonel Edward S. Adamkewicz, Jr., JAGC, and Major James F. Nagle, JAGC.

Major John T. Meixell, JAGC, argued the cause for the appellee. With him on the brief were Colonel R. R. Boller, JAGC, and Captain Richard J. Fadgen, JAGC.

Before CARNE, O'DONNELL and FOREMAN, Appellate Military Judges.

OPINION OF THE COURT

CARNE, Senior Judge:

Contrary to his pleas, the appellant was convicted by a general court-martial with members of one offense of indecent assault upon a female soldier, one offense of taking indecent liberties with a female under sixteen years of age, one offense of assault consummated by a battery upon a female soldier, one offense of assault upon a female soldier, two offenses of housebreaking, and two offenses of window peeping[1] in

---

1. As set out below, the two specifications of window peeping were identical except that one

was alleged as being prejudicial to good order and military discipline in the Armed Forces and

violation of Articles 134, 128, 130, and 134 of the Uniform Code of Military Justice, 10 U.S.C. §§ 934, 928, 930, and 934, respectively.[2] The convening authority approved the sentence adjudged which provided for a dishonorable discharge, confinement at hard labor for thirty-six months, forfeiture of $334.00 per month for thirty-six months and to be reduced to the grade of Private (E–1).

The appellant assigns four errors in the proceedings as follows:

(1) The evidence is insufficient to support the findings of guilty of the offenses of indecent assault, assault and battery, assault and housebreaking because of inadequate identification of the appellant as the perpetrator.

(2) The military judge erred by refusing to give an instruction on eyewitness identification.

(3) The military judge's instructions on the window peeping offense were prejudicially erroneous since they: (a) equated the wrongfulness of the peeping with the occupant's lack of consent and thereby permitted conviction in the absence of a culpable mental state, (b) failed to include mistake of fact which was raised by the defense evidence.

(4) The military judge's instructions on reasonable doubt were erroneous.

The pertinent evidence with regard to the first and second alleged errors is as follows:

At about 0500 hours, 16 July 1980, Private First Class (PFC) "W" was asleep in her barracks room (Room 308 on the third floor of Building 1011) when she was awakened by a knock on the door. She opened the door and a thin black male, approximately 5'7" in height, wearing a green T-shirt and tan pants entered the room. He closed the door, moved toward her with his arms extended, but she pushed him away and turned on the room light. She then opened the door and pushed him back in the hallway. There was an exit light in the hall by the doorway and she was able to see his face. After he left she sat on the bed momentarily but went out in the hallway when she heard screams coming from down the hall. She saw PFC "S" in the hall and they identified the screams as coming from Room 302. She knocked on the door and the same man ran out in the hall and out of the building. While running away he looked back and she again saw his face by the hallway light. About thirty minutes later while standing by the Charge of Quarters desk a report was received from two barracks mates that the same man was outside the barracks. This was reported to a Sergeant First Class (SFC) "S" and they all went outside Building 1011. PFC "W" saw the man walking across the street and she identified him by his clothing and build as the same man that had been in her room. SFC "S" told the man to stop but he began to run. SFC "S", PFC "W" and the other female soldiers ran after the man and chased him down the street near Building 1031 where he was apprehended. PFC "W" identified this man as the same man that had been in her barracks room. She was within three feet of him and he had a mustache which she first noticed when he was in her room but she noticed no odor of alcohol. She also made an in-court identification of the appellant as being that same man. She had also made an identification of the appellant without any difficulty, from a photographic lineup about a week

the other was alleged as conduct of a nature to bring discredit upon the Armed Forces:

> In that Private E–2 Mark D. Foster, U. S. Army Howitzer Battery, 3d Squadron, 3d Armored Cavalry Regiment, did at Fort Bliss, Texas, an installation under exclusive military jurisdiction, on or about 18 October 1980, during the hours of darkness, wrongfully, willfully, and without authority look through a window into quarters located at 1465 Slater which was then occupied by Charles and Annette Harry; ...

The trial judge instructed the court members that these were one offense although separate findings could be submitted for each. He also instructed in effect that these offenses were multiplicious for sentencing purposes.

2. The appellant was found not guilty of the offenses of communicating a threat, assault with intent to commit rape, housebreaking, and sodomy, in violation of Articles 134, 130 and 125, Uniform Code of Military Justice.

and a half after the incident. She did not base her subsequent identification solely on the impression of the man as she remembered seeing him when apprehended at Building 1031, although seeing him again assisted her in the identification. She determined it was the same man and she still thought so at the trial based on the way he looked.

At approximately 0510 hours on 16 July 1980, PFC "G" who lived down the hall in Room 302 of the same barracks was asleep when she heard a knock at her door. She got out of bed turned on the light and opened the door. A slim, black male about 5′6″ to 5′7″ in height, with real short hair was standing there. He was dressed in a green T-shirt, tan pants and tennis shoes. He stated to PFC "G", "I want you." He then entered the room and grabbed her, tearing her night shirt. They fell to the floor and he started caressing her breast and crotch area. He also kissed her on the back of her neck. She tried to grab his hair but could not, so she bit him on the hand but she was not sure it was hard enough to leave a mark. At that point someone knocked on the door and he got up and ran out. This entire incident lasted only a minute or two, the lighting was poor, and most of the time the man was behind her, therefore, she did not get a good look at his face. He did not smell of alcohol and she does not remember seeing a mustache. She did not see this man again until the CID lineup. Three separate lineups with some different people were held and she understood she was to pick out someone from each one. Accordingly, she picked out someone she was not sure of but on the last lineup she was certain. However, she could not positively identify the man as being in the courtroom but it is possible that it was the appellant. In her selections at the lineups, she was unsure of the first but did select the appellant after some hesitation, she picked someone other than the appellant at the second, but picked the appellant out with certainty at the third. The main reason for her selection was his build, not his clothes. In the third selection she picked the appellant as the man she was sure was the assailant.

Between 0500–0515 hours on 16 July 1980, PFC "S" was sleeping in her barracks room, Room 304, Building 1011, when she was awakened by the screams of a female in Room 302, next door. She got up and went out into the hall where she saw PFC "W". Because of the screams PFC "W" knocked on the door to Room 302 and a thin built black man about 5′9″—5′10″ tall with short hair and wearing tan pants, a green shirt and tennis shoes ran out. As he ran out of the room, he struck PFC "S" on the side of her face with his hand. The man departed through an exit door. PFC "S" ran back into her room and telephoned the Charge of Quarters. Shortly thereafter she saw the man get into a gray or silver Honda automobile that was parked in front of the barracks building. Approximately thirty minutes later she was looking out the barracks window and saw the same man, as identified by his clothing and build, walking near the barracks. She immediately ran downstairs and informed SFC "S". SFC "S" and some other soldiers ran outside and he ordered the person to stop but the man started running toward Building 1031 where he was caught. Based on his clothing and his build, PFC "S" believed the man that was caught was the same man that was in the barracks. She only saw his face in the barracks for a couple of seconds and she did not notice whether or not he had a mustache. She did not smell alcohol on his breath. She still believes she saw the same man enter a vehicle that was parked in front of the barracks and thirty minutes later saw him walking near the barracks. After he was apprehended at Building 1031, she got a good look at him for about two to three minutes from a distance of about three feet. At this time the lighting was good. She participated in three separate lineups containing some of the same people and she picked the appellant one out of three times which was at the first viewing.

SFC "S" was Staff Duty NCO on 16 July 1980 and reported to Building 1011 at about 0510 hours. He was wearing fatigues. As he approached the building some female

soldiers reported there was a male on the third floor. Later that morning one of the soldiers informed him she saw the man walking in the parking lot near the barracks. He called to the man to stop three or four times but the man continued walking. Then the man started running so SFC "S" chased him but the man moved out very fast and "S" lost sight of him after he had gone past three buildings. "S" continued toward Building 1031 and saw a female sergeant who reported she saw a man running behind Building 1031. He looked around the building and was then informed the man had been caught and was being held upstairs in Building 1031. He went in to see him and verified that it was the same man he had chased. He stood about four to five feet from the man but noticed no alcohol on his breath. Earlier that morning he did see a small gray or silver Honda automobile leaving the area of Building 1011 at a high rate of speed but he did not notice the occupants. In court, SFC "S" identified the appellant as the same person he had chased and observed in Building 1031.

Between 0530 and 0600 hours on 16 July 1980, SFC "M" observed a small built black man wearing an Army green T-shirt, civilian pants and sneakers running across the street near Building 1031. She saw another man in fatigues chasing him. She momentarily went inside and when she came back out the man being chased had disappeared. She talked to the pursuer, a sergeant, and ascertained the reason for the chase. She then began looking for the man at a nearby building and saw him coming out of a basement stairwell. She asked him to come with her and he did. Almost immediately the military police arrived and took him in custody. She is positive that the man apprehended was the same man she saw running and in court she identified the appellant as that man. She smelled a strong odor of alcohol on the man's breath, and he was out of breath from running. It was an old odor and he was jabbering but she could understand what he was saying. Three female soldiers came in and observed him when he was in the building.

Evidence was adduced by the defense that the appellant did not own any automobile and that the appellant's unit had been searched and no gray or silver Honda automobile described by two of the prosecution's witnesses was located. It was also established by the testimony of the appellant's roommate that the appellant has never been seen driving or riding in a silver or gray vehicle and that the appellant has had a mustache for the past eleven or twelve months. Another soldier who was in the appellant's unit testified he knew of no one in the unit with a silver or gray Honda automobile. He has always observed that the appellant has had a mustache but that it was much thicker at the trial than it was in March and April 1980.

The appellant testified in his own behalf substantially as follows:

I was in Juarez on the night and morning of 15–16 July and went from bar to bar where I had lots of drinks of rum and coke. I also drank some beer at the unit before going to Juarez. I went by myself in a cab and went to at least three or four bars but I don't know the names of any of them. I was in Juarez about four to five hours. I did not count my drinks. I returned to the Fort by cab and was let off by the Texaco filling station because I didn't have enough money to ride all the way to my unit. I don't have any idea of how much money I had when I left for Juarez. I left most of it at the barracks. I had about $7.50 left when I decided to return. I have tried to locate the cab that brought me back from Juarez but have had no results. I returned very early in the morning and I decided to go to the School Brigade mess hall since I was in that area. I did not go to my assigned mess hall because of the long line and I hadn't changed my clothes. The mess hall at the School Brigade doesn't have any lines and I didn't want to miss the formation in my unit. However, when I got to the Brigade mess hall it was closed and I decided to go to my battery area by a back way so that if they were having formation I wouldn't be seen. This is a longer way to go. When I got near Building 1010, I saw some people coming toward me. They were

hollering and kept coming and I was kinda high and didn't think so good; I just ran out of impulse. I remember SFC "S" hollering at me and he was in uniform. I did not stop to see what he wanted but I did not think he was after me for being late for my unit's formation. I ran by Building 1031 and went behind it. Then I went down a stairway and stayed a couple of minutes. Then I realized I had no reason to hide so I came up. I didn't see anybody until I came around the building and saw the sergeant. She told me to come with her and I did. I did not run from her. Building 1031 is in the opposite direction from my unit. I have never been on the third floor of Building 1011 and do not know any of the women who testified against me. I have worn a mustache for about a year. I do not own nor know anyone that owns a silver or gray Honda CVCC. I did not assault PFC's "G", "W" and "S."

■ The appellant submits that the evidence does not sufficiently identify him as the individual who committed the acts in the early morning hours of 16 July 1980 since the identifications made by PFC's "W", "G" and "S" are not compelling and the absence of any physical evidence linking the appellant to the offenses renders their testimony critical. We disagree. Although the overall testimony of the three victims contains some discrepancies and differences, this does not appear unusual giving due consideration to the factual situation in which they observed their assailant. Each victim was awakened from a state of being asleep, each encounter with their assailant was of short duration, at most a minute or two, and each incident, due to the actions of the assailant obviously engendered fear, excitement and surprise in the victims which quite naturally would affect their power of

observation. Despite the adverse conditions and the differences of observation resulting therefrom, the witnesses essentially agreed that their attacker was a black male with short hair and of slight build and of short to medium height,[3] wearing a green T-shirt, tan pants, and tennis shoes. A person of this description was observed outside the barracks, pursued down the street and apprehended. The identification of the appellant was bolstered by the testimony of two disinterested witnesses SFC "S" and SFC "M". Finally the appellant admitted on the witness stand that he was the person outside Building 1011 who was ordered to stop but ran, that he was pursued and subsequently apprehended. His explanations for being in the area at that time of the morning and fleeing when he was called upon by SFC "S" to stop are most certainly open to question. We reject his explanations as obviously did the trial court. Furthermore, "the law is ... well settled that the flight of the accused is competent evidence against him as having a tendency to establish his guilt." *Allen v. United States*, 164 U.S. 492, 499, 17 S.Ct. 154, 156, 41 L.Ed. 528 (1896); *United States v. Buchanan*, 19 U.S. C.M.A. 394, 41 C.M.R. 394, 397 (1970); *United States v. Harris*, 6 U.S.C.M.A. 736, 21 C.M.R. 58, 64 (1956).

■ We are satisfied from our independent review of the record beyond a reasonable doubt that the evidence supports the identification of the appellant as the attacker. We are also satisfied that the trial judge's instructions clearly focused on the issue of identification of the appellant,[4] particularly where the instructions included specific guidance on the credibility of witnesses and inconsistencies in testimony. These instructions clearly operated to direct the court members' attention to the possi-

---

**3.** We observe that the appellant's height and weight as recorded in the official Military Personnel Records were 5'7" and 142 pounds (Pros. Ex. 15).

**4.** Although the defense counsel made no requests or objections and offered no proposed instructions on this issue during the trial judge's out-of-court hearing on the development of instructions, later in the proceedings at

a side-bar conference he asked the trial judge if he were going to give an instruction on misidentification. When the trial judge replied in the negative, the defense counsel responded "I was under the impression that the Court would automatically give the defense." However, no additional requests or objections on this issue were submitted by the defense.

bility of misidentification, particularly since the defense counsel had cross-examined the witnesses extensively as to their identification of the appellant, the appellant denied that he committed the offenses and the defense counsel presented a most forceful argument on the issue.[5]

A brief recital of the evidence pertinent to the window peeping offense is appropriate in order to discuss the errors assigned:

At approximately 0330 hours on 18 October 1980, Specialists Four "B" and "K", members of the 591st Military Police Company, were performing surveillance duty in a privately-owned vehicle which was parked in the alley behind Quarters Number 1476 in the housing area of Fort Bliss. At that time they observed a black male, approximately 130 to 140 pounds in weight, wearing a red and white baseball cap, red shirt, light colored pants, and a dark blue jogging jacket walking in an easterly direction between Quarters 1476 and 1477. This person crossed the alley and disappeared between two buildings. At about 0400 hours the same person returned on the same route walking westerly between Quarters 1476 and 1477, crossed the street and walked up on the front porch of Quarters 1465 where the porch light was on and some light was coming from within the house. He stood at the door for a short period of time, turned around, walked back down the steps and bent down in order to peer under the blinds into the left front window. He did not knock at the door or ring the door bell. At that point, Specialists "B" and "K" got out of their vehicle, radioed for assistance, and ran toward Quarters 1465. There was one vehicle parked in front of Quarters 1465 at the time. According to Specialist "K" the individual then went to the rear of the house and continued around the house to the front and then walked in a southerly direction on the street. Specialist "B" did not observe the individual go to the rear of the house but he did see the person walking away toward the South in the housing area.

Specialists "B" and "K" followed him down the street but were not able to keep the individual in sight at all times. Shortly thereafter the appellant was apprehended by Staff Sergeant "E" and Investigator "S" who responded to the call for assistance. Specialists "B" and "K" both identified the appellant in court as the individual they had observed looking in the window at Quarters 1465 and who was apprehended by Staff Sergeant "E" and Investigator "S" a few blocks away. Specialist "B" admitted that some of his testimony in court was inconsistent with his testimony at the Article 32, but it was changed after discussion with the trial counsel and Specialist "K" because he realized there were some differences. He insisted that there were valid reasons for the changes and explained why he saw things differently. Private First Class and Mrs. Charles Harry and their children reside in Quarters 1465, Slater Road, Fort Bliss and were asleep at about 0400 hours, 18 October 1980. When they retired for the night earlier they left the lights on in the kitchen, the bathroom, and the front porch. The blinds on the windows in the living room do not go all the way down and it is possible to see in the living room by looking under the blinds. The Harrys do not know the appellant and there is no reason why he should be on their porch at 0400 hours in the morning. They do not like it for strangers to be looking in their windows at night.

The appellant admitted going up on the porch of Quarters 1465 and testified that he did so because he had seen a car that resembled one owned by a friend of his go through that way and he wanted to get a ride because it was cold outside. The car was parked in front of the house and there was a light on the porch so he just took it for granted that it might be the friend's house. He walked up to the door and was going to knock but he did not hear anyone inside. Since he could not see through the window he came off the porch and then he realized it was not his friend's car. He then

---

5. It is apparent that the court members focused on the issue of eyewitness identification because they acquitted the appellant of four of the more serious charges involving a different victim where the defense relied on misidentification.

left and started walking back to the barracks. He did not go to the rear of the building.

■ At the outset we find the appellant's explanation for going up to the porch and looking through the window implausible, particularly since he initially walked right past Quarters 1465 and the parked vehicle at approximately 0330 hours going toward the east, crossed the alley and disappeared between two buildings for about thirty minutes. He then retraced his steps heading toward the west and immediately went on the porch of Quarters 1465, because there was a light on the porch, stood at the door, without knocking, and then bent down and looked into the window. He then stepped off the porch, realizing it was not his friend's house. Although the appellant denied it, Specialist "K" testified the appellant then went to the rear of the house and came back around before proceeding down the street. Such actions at 0400 hours in the morning in the housing area of a military post, with no explanation other than he was seeking a ride from a supposed friend to go to his barracks, severely strain our assessment of his credibility.[6] We conclude that the defense of mistake of fact was not raised as to the window peeping offense. At most the appellant's testimony indicates that he was mistaken regarding the lawfulness of looking into a supposed friend's house without the friend's consent. Accordingly, the trial judge was under no *sua sponte* duty to instruct thereon.

While instructing on this offense the judge advised the court members that to find the appellant guilty, among other specified elements, they must find that he willfully looked in the window and that the looking was wrongful and without authority. He also advised the court that "looking into the window is wrongful if done for the purpose of observing the persons therein without their consent, even if they were not actually observed." The defense counsel at trial objected to the definition of wrongfulness urging that this instruction omitted the criminal state of mind and it is asserted on appeal that the trial judge's instructions erroneously equated the wrongfulness of the peeping, with the occupant's lack of consent and thereby permitted conviction in the absence of a culpable mental state.

■ Although there are few reported military cases on the offense of "window peeping"[7] it is certain that such conduct is offensive, would outrage the sense of decency of others, tends to disturb the peace and quiet, and provoke a breach of peace. Such conduct clearly falls within the definition[8] of and constitutes the offense of disorderly conduct. *United States v. Johnson*, 4 M.J. 770 (A.C.M.R.1978); *United States v. Manos*, 24 C.M.R. 626 (A.F.B.R.1957), *reversed on other grounds*, 8 U.S.C.M.A. 734, 25 C.M.R. 238 (1958); *Carey v. District of Columbia*, 102 A.2d 314 (D.C.1954). *See also United States v. Snyder*, 1 U.S.C.M.A. 423, 427, 4 C.M.R. 15, 19 (1952) (holding that an act constitutes conduct prejudicial to good order and discipline, if it evinces "a

6. In this regard we observe from the appellant's admission to Special Agent Fenner on 8 June 1980 concerning the offense of taking indecent liberties with a female under sixteen years of age, he admitted rubbing the victim's buttocks at about 0500 hours on that date, while he was "walking and thinking" in a housing area of Fort Bliss (Pros. Ex. 1). From our review of the evidence pertaining to the offenses of which he was convicted, the conclusion is inescapable that the appellant spent a considerable amount of time walking through the housing areas and barracks areas of Fort Bliss during the period June through October 1980 at unusual hours without any visible or lawful business explaining or justifying his presence.

7. An act frequently described as performed by a "Peeping Tom." The words "Peeping Tom" have a commonly understood meaning in this country as being one who sneaks up to a window and peeps in for the purpose of spying on and invading the privacy of the inhabitants. *Matter of Banks*, 295 N.C. 236, 244 S.E.2d 386 (1978).

8. "Disorderly conduct has been correctly defined as being conduct of 'such a nature as to affect the peace and quiet of persons who may witness the same and who may be disturbed or provoked to resentment thereby'" (citations omitted) *United States v. Tabor*, 2 C.M.R. 330, 334 (A.B.R.1951).

wanton disregard for a moral standard generally and properly accepted by society"); *United States v. Clark*, 22 C.M.R. 888 (AFBR), *pet. denied*, 7 U.S.C.M.A. 790, 22 C.M.R. 331 (1956) (holding that window peeping constitutes conduct prejudicial to good order and discipline and conduct of such nature to bring discredit on the armed forces in violation of the first and second clause of Article 134, Uniform Code of Military Justice); *United States v. Baker*, 41 B.R. 209 (C.M. 263231, 1944) (holding that window peeping is contrary to ordinary standards of decency and constitutes conduct unbecoming an officer, is also disgraceful and brings discredit upon the service in violation of the 96th Article of War); and *Grand Rapids v. Williams*, 112 Mich. 247, 70 N.W. 547 (1897) (holding that an improper or unlawful purpose is not necessary to constitute the offense of window peeping, it is sufficient if a trespasser looks through a window for no legitimate purpose without the consent of the owner). *But see Kahalley v. State*, 254 Ala. 482, 48 So.2d 794 (1950) (unlawful peeping statute held void for vagueness), and *The Crimination of Peeping Toms and Other Men of Vision*, 5 Ark.L.Rev. 388 (1951) (because of absence of *mens rea* window peeping statute is subject to due process and vagueness challenges).

■ The appellant submits that the language in *Grand Rapids v. Williams*, *supra*, in effect requires a criminal state of mind on the part of the person looking in the window. In our view, once a trespass and a peering through the window, without consent, have been established, it is sufficient *mens rea* unless the accused raises the defense of a legitimate purpose in his actions. We also find this defense was not raised by the evidence. Furthermore, the fact that no persons were observed in the room into which he peered is of no consequence. *United States v. Clark, supra* and

*Butts v. State*, 97 Ga.App. 465, 103 S.E.2d 450 (Ga.1958). The gravamen of window peeping is invading the privacy of other persons by spying upon them in their premises whether or not they are actually in view. Such acts constitute disorderly conduct which is a relatively minor offense, with limited maximum punishment.[9] We conclude that only a general criminal intent need be proven and the trial judge included this requirement in his instructions on wrongfulness. *United States v. Johnson*, 48 C.M.R. 282, 284–85, n.3 (A.C.M.R.1974). *See United States v. Doyle*, 3 U.S.C.M.A. 585, 14 C.M.R. 3 (1954); *United States v. Bowden*, 24 C.M.R. 540 (A.F.B.R.), *pet. denied*, 24 C.M.R. 311 (1957); *State v. Reynolds*, 243 Minn. 196, 66 N.W.2d 886 (1954); and *City of Grand Rapids v. Bateman*, 93 Mich. 135, 53 N.W. 6 (1892). We are satisfied that the military judge's instructions as to this offense were adequate.

■ Lastly, the appellant alleges that the trial judge's instruction on reasonable doubt was defective because he refused a defense request to revise his instruction by substituting the terminology "hesitate to act" for "willing to act." Although the "willing to act" language was condemned in *United States v. Cotten*, 10 M.J. 260 (C.M.A.1981), its use does not mandate reversal. *United States v. Martin*, 13 M.J. 66 (C.M.A.1982). *See also United States v. Moss*, 10 M.J. 329 (C.M.A.1981), and *United States v. Woodrum*, 10 M.J. 329–330 (C.M.A.1981) (summary dispositions). After considering the error noted and all the evidence, we are convinced that the evidence of guilt was of sufficient strength to preclude any fair risk of harm to the appellant. *United States v. Taylor*, 10 M.J. 836 (A.C.M.R.1981); *United States v. Johnwell*, 11 M.J. 747 (A.C.M.R. 1981).

■ One other matter warrants our attention. As there was a timely objection to

---

**9.** Paragraph 127c, Manual for Courts-Martial, United States, 1969 (Revised edition) provides:

Article 134
Disorderly:
In command, quarters, station, camp, or on board ship. Confinement at hard labor and

forfeiture of ⅔ pay per month not to exceed 1 month.

Under such circumstances as to bring discredit upon the military service. Confinement at hard labor and forfeiture of ⅔ pay per month not to exceed 4 months.

the multiplicious pleading of the window peeping offense, even though the specifications were treated as multiplicious for sentencing, we conclude one of the specifications should be dismissed. *United States v. Strand,* 6 U.S.C.M.A. 297, 20 C.M.R. 13 (1955); *United States v. Huggins,* 12 M.J. 657 (A.C.M.R.1981). Under the facts we determine that the nature of the offense was essentially conduct prejudicial to good order and discipline. Accordingly, we will dismiss the specification alleging the same conduct as service discrediting.

The findings of guilty of Specification 2 of the Additional Charge are set aside and that charge is dismissed. The remaining findings of guilty are affirmed. In view of the severity of the remaining charges and the correct maximum punishment authorized, when compared with the sentence adjudged, we find the appellant suffered no prejudice as to the sentence. The sentence as approved is affirmed.

Judge O'DONNELL and Judge FOREMAN concur.