**UNITED STATES of America**

v.

**Darrel A. WESTON, Staff Sergeant (E–6), U.S. Marine Corps.**

**NMCCA 200600985.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 22 Dec. 2005.

31 March 2008.

For Appellant: Maj Richard Belliss, USMC.

For Appellee: Capt Geoffrey Shows, USMC.

Before THE COURT EN BANC.

**PUBLISHED OPINION OF THE COURT**

GEISER, Senior Judge:

A general court-martial with officer members convicted the appellant, contrary to his pleas, of housebreaking and two specifications of service discrediting conduct by invading the privacy of another, in violation of Articles 130 and 134, Uniform Code of Mili-

tary Justice, 10 U.S.C. §§ 930 and 934. The appellant was sentenced to a dishonorable discharge, reduction to pay grade E–1, total forfeiture of pay and allowances, and confinement for seven months. The convening authority approved the sentence as adjudged.

On 12 September 2006, the appellant filed a brief with six assignments of error.[1] The Government answered on 23 October 2006 and the appellant filed a reply on 30 October 2006. On 17 April 2007, a panel of this court specified four additional issues.[2] On 25 September 2007, a panel of this court found merit in the appellant's first assignment of error challenging the legality of the Government's consent search of his residence in light of *Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006).[3] The panel held that "the search of the appellant's residence was unreasonable ... and that the exclusionary rule's remedial objectives outweigh 'its substantial social costs' in this case."[4] The court set aside the findings and sentence and authorized a rehearing.[5]

On 25 October 2007, the Government filed a motion for *en banc* reconsideration of the panel decision, which the appellant opposed. On 10 December 2007, this court granted the Government's motion for *en banc* reconsideration and directed oral argument on the following issues:

> a. Whether the search of the appellant's residence, with the consent of the appellant's wife, was reasonable under the Fourth Amendment to the United States Constitution when the appellant had previously objected to such a search; and

> b. Whether the "inevitable discovery" exception to the exclusionary rule applies to the evidence seized from the appellant's home, rendering that evidence admissible at trial.

On 13 February 2007, oral argument was conducted at Georgetown University Law Center as part of this court's outreach program.[6]

We have considered the various pleadings and the very detailed and helpful oral argument. We conclude that the search of the appellant's residence, with the consent of the

---

**1.** The appellant initially raised six assignments of error asserting that (1) the military judge's conclusion of law that consent to search the appellant's home was voluntary is erroneous in light of *Georgia v. Randolph;* (2) the military judge's instructions to the members concerning the elements of the specification under Charge II (housebreaking) were incorrect; (3) the military judge's instructions to the members concerning the elements of Specification 1 of Charge III (invasion of privacy) were incorrect; (4) the military judge's instructions to the members concerning the elements of Specification 2 of Charge III (invasion of privacy) were incorrect; (5) the military judge erred in determining, for purposes of sentencing, that the most closely related offense to Specification 1 of Charge III (invasion of privacy) was cruelty and maltreatment under Article 93, UCMJ, 10 U.S.C. § 893; and (6) the combination of trial counsel's references to uncharged misconduct during direct testimony and closing argument unfairly inflamed the passions of the members into believing that the appellant is a sexual predator.

**2.** (1) If the search of the appellant's residence was unreasonable in light of *Randolph*, are there any exceptions that would allow admission of the seized evidence; (2) if the initial search of the appellant's home was reasonable, whether the Government had authority to remove personal property from the appellant's home once the appellant's wife orally withdrew her written permission for the Government to "remove and re-

tain any property of papers found during the search" as stated in the permissive authorization for search and seizure of 18 May 2004 (Appellate Exhibit IV at 19); (3) if the Government did not have authority to remove personal property from the appellant's home, whether there is an exception to the warrant requirement that made seizure of that personal property reasonable in light of *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001); and (4) if the search of the appellant's residence and the seizure of his personal property were unreasonable *ab initio* or after consent was withdrawn, and no exceptions to the warrant requirement are applicable, whether the exclusionary rule would be applied under the facts of this case.

**3.** *United States v. Weston*, 65 M.J. 774 (N.M.Ct. Crim.App.2007).

**4.** *Id.* at 785 (citing *Hudson v. Michigan*, 547 U.S. 586, 126 S.Ct. 2159, 2163, 165 L.Ed.2d 56 (2006)).

**5.** *Id.*

**6.** We again wish to thank Senior Assistant Dean Bellamy, J.D. Program & Adjunct Professor Georgetown University Law Center (GULC), the professors, staff, and students at GULC for providing such a welcoming and superbly suited venue for our oral argument.

appellant's wife, was reasonable under the Fourth Amendment to the United States Constitution notwithstanding the appellant's prior objection to such a search. We further find that even if law enforcement's reliance on the wife's consent to search was unreasonable, that the evidence obtained from the search of the appellant's residence would be admissible under the doctrine of inevitable discovery. We conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), 10 U.S.C. §§ 859(a) and 866(c).

### Background[7]

The appellant was the head court reporter at the Marine Corps Base, Kaneohe Bay, Hawaii, Law Center. The victim, Sergeant (Sgt) E, was the appellant's subordinate in the court reporting shop. The appellant's family served as Sgt E's sponsor and provided lodging for the victim and her son pending her assignment to housing. While residing with the appellant's family, Sgt E became aware that the appellant used small discreet surveillance equipment to watch the family dog. Moreover, Sgt E was aware of the appellant's high degree of technical electronic expertise. Over time, the appellant developed and expressed more than a professional interest in the victim, but that interest was not reciprocated.

The appellant placed a micro-surveillance camera in a hollowed-out electric razor and placed the razor in the work-place bathroom shared by the appellant, the victim, and a military judge. The camera was powered by batteries and transmitted a live video signal to a receiver attached to a video cassette recorder (VCR) located on the appellant's desk, a few feet from the shared bathroom. The transmitted images were recorded onto a VHS-format video tape in the VCR and later transferred to a computer hard drive in the appellant's home.[8]

On 18 May 2004, the victim noticed an electric razor with no power plug sitting in the shared bathroom. She picked it up and discovered it was very light and did not work. Suspicious, she believed it might contain a covert video camera. She believed she had seen the same razor on other occasions and that the empty power plug hole was always oriented toward the toilet. The victim opened the razor and discovered a micro-surveillance camera pointing out where the power plug should have been.

The victim immediately suspected the appellant. She called the appellant's wife to report her discovery and to recommend that Mrs. Weston not let her husband "lock himself in the computer room." Immediately following this phone call, Sgt E called the Criminal Investigations Division (CID) and reported the incident. She gave an oral statement of the circumstances of her discovery. Over the next several minutes, the victim received several telephone calls or text messages from the appellant's wife. At one point, the appellant's wife stated that the receiver for the camera was in their home and that everything was "alright." In addition, the appellant left several messages on her home telephone-recording device saying that he needed to speak to her and "will you just give me one minute? Please, just one minute."

Based on the information provided by the victim, CID Agent Grimes contacted his civilian supervisor, Agent Stevenson. CID sent a military policeman (MP) to the appellant's on-base residence where the MP informed the appellant's wife that CID would like the appellant to come in for an interview. The appellant and his wife drove to CID together and voluntarily presented a functional electric razor, a receiver, and recording equipment to Agent Stevenson. This equipment was not requested by CID. The appellant and his wife stated that the presence of the "fake electric razor" in the bathroom was

---

7. Background facts are taken verbatim from the military judge's findings of fact on the appellant's motion to suppress evidence obtained from his home computer, and from testimony in the record of trial. AE XXV.

8. The appellant also entered the victim's on-base residence without her consent when the victim's son was staying with the appellant's family and took still photographs of the victim's underwear drawer in her bedroom and the shower head in her bathroom.

"pure accident" and that the appellant had "mistakenly taken the wrong razor to work that day." The appellant and his wife were then separated and placed in different interview rooms.

At one point during the separate interviews, Agent Stevenson asked the appellant for consent to search his residence. The appellant refused. Shortly thereafter, Agent Stevenson went to the appellant's wife, and read and explained to her a Permissive Authorization for Search and Seizure (PASS). The appellant's wife made 14 separate initials on the form including a correction to the color of one of the family cars. She was clearly apprised of what her husband was accused of from various sources including both the victim and Agent Stevenson. The appellant's wife appeared anxious to provide information to have the situation defused and dismissed. Agent Stevenson obtained her consent to search the family residence.[9] At this point, Mrs. Weston did not ask whether her husband had been asked for his consent, and the agent did not volunteer the fact that her husband had refused to give consent.

Agent Stevenson, the appellant's wife, and other security personnel proceeded to the appellant's house. Prior to entering the home, one of the CID agents called the duty trial counsel and briefed him on the situation.[10] The attorney agreed they could conduct the search based on the wife's consent. The agents entered the home and, with Mrs. Weston's permission, asked the appellant's children questions relevant to their inquiry. Following this, with Mrs. Weston's assistance,[11] CID agents executed the consent search.

Approximately 20 minutes into the search, the appellant's wife received a phone call from an attorney friend of the family who

asked whether the family was well. Mrs. Weston replied that they were and expressed no concern that anything was amiss vis-a-vis the police search. Two to three minutes later, the attorney called again to advise Mrs. Weston that the search was not in the family's best interest and that she could terminate it if she wished. Mrs. Weston asked Agent Stevenson if her husband had also authorized the search and was informed he had not. At this point, Mrs. Weston terminated her consent to search.

Prior to Mrs. Weston's termination of consent, the CID had already seized two computers and multiple media storage devices. Mrs. Weston initially demanded the agents leave the seized material. The CID agents again called the duty trial counsel for advice and were informed it was lawful for them to remove evidentiary items that had already been seized at the time Mrs. Weston withdrew her consent.[12] After conferring with her attorney-friend on the phone, Mrs. Weston yielded and permitted the agents to depart with the seized items.

The seized items were properly logged into CID custody but were not immediately searched. Twenty-nine days later, CID obtained a written authorization from the commanding general to search the appellant's personal computer. A forensic laboratory executed the search and retrieved 31 deleted videos and still images of the victim in various states of undress in the shared bathroom at the law center. Also retrieved were three deleted photographs depicting the inside of the victim's residence.

### Legality of the Search

■ A military judge's decision to admit or exclude evidence is reviewed for an abuse

9. The appellant's wife was in her mid-thirties, the mother of two children, and was employed at a Honolulu law firm. Her primary function at the firm was to update law library materials; a tasking requiring a fairly good modicum of concentration and innate intelligence. She had been married to the appellant for 15 years and evidenced a sincere desire to maintain her stable marriage. She was a high school graduate, articulate, and well spoken. She claimed a good degree of familiarity with computers and the ability to ably navigate the Internet. AE XXV.

10. Record at 71.

11. Mrs. Weston escorted the agents to the family computer room and provided a box for the agents to consolidate some of the materials seized. She was characterized as "exceptionally cooperative." AE XXV.

12. Record at 76.

of discretion.[13] The military judge's "[f]indings of fact will not be overturned unless they are clearly erroneous or unsupported by the record."[14] We review conclusions of law de novo.[15] "We will reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law."[16] The appellant does not challenge the accuracy of the military judge's findings of fact. Having carefully reviewed the record, we concur with the appellant's assessment and adopt the military judge's findings of fact as our own.

The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches by Government actors in areas and places where a reasonable person would have an expectation of privacy.[17] The "touchstone" of the Fourth Amendment is "reasonableness."[18] Reasonableness is measured in objective terms by the totality of the circumstances.[19]

A search of a person's home without a warrant is ordinarily unreasonable, *per se.*[20] Various exceptions to this general rule exist however. One such exception is when an individual possessing apparent authority over the premises to be searched voluntarily consents to a search of the premises.[21] In the instant case, the Government argues that, because the appellant's wife voluntarily consented to the CID search, the warrantless search of their home was constitutional.

In his first assignment of error, the appellant claims that the search conducted in reliance on his wife's consent was unreasonable in light of the appellant's emphatic refusal to consent to the search. In support, the appellant cites the United States Supreme Court's recent decision in *Randolph*. Appellant's Brief and Assignments of Error of 12 Sep 2006 at 5.

In *Randolph*, police were called to the Randolph home for a domestic dispute. Randolph's wife, in her husband's presence, told the police that Randolph was a cocaine user and that there was evidence of such in the house. Randolph, standing literally at the threshold of his house, unequivocally refused to consent to a search of the house. His wife, however, readily gave consent to search and led an officer to Randolph's bedroom, where a section of a drinking straw with a powdery drug residue was found.

When considering the validity of the search based on the wife's consent, the Court applied a "widely-shared social expectations" test to determine if the wife's consent could override the husband's objections under the circumstances. The Court determined it could not. The Court held that, since the wife had no recognized authority in law or social practice to prevail over her husband's contemporaneous objection, her disputed invitation, without more, gave police no better claim to reasonableness in entering than they would have had in the absence of any consent at all.

The Government asserts that *Randolph* is inapposite because, in the instant case, the appellant was not physically present at the threshold of the residence when he denied consent. This, the Government argues, is a critical distinction. Government Answer dated 23 Oct 2006 at 4. The Government asserts that the appropriate precedent to apply regarding an appellant who is not physically present at the threshold of his home is *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

13. *United States v. Seay*, 60 M.J. 73, 77 (C.A.A.F. 2004).

14. *United States v. Reister*, 44 M.J. 409, 413 (C.A.A.F.1996).

15. *Id.*

16. *United States v. Sullivan*, 42 M.J. 360, 363 (C.M.A.1995).

17. *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

18. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (citation omitted).

19. *Id.*

20. *Georgia v. Randolph*, 547 U.S. at 109, 126 S.Ct. 1515.

21. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Clow*, 26 M.J. 176, 183 (C.M.A.1988).

In *Matlock*, law enforcement officers arrested the defendant, a bank robbery suspect, in the yard in front of his house. Without asking the defendant whether he would consent to a search, he was placed in a police car. Officers went to the door of the house and were admitted by a woman. The officers told her that they were looking for money and a gun and asked if they could search the house. She consented to a search, including the bedroom she shared with the defendant. The Supreme Court upheld the search noting that "the consent of one who possesses common authority over premises or effects is valid as against the absent, non-consenting person with whom that authority is shared." [22] The Court reasoned that a person who shares premises with another "assumes the risk" that, in his absence, the other party will consent to a search.

We begin our analysis by noting that the Court in Randolph expressly disavowed any intention of undercutting the continuing viability of *Matlock*.[23] The Court drew what it characterized as a "fine line" and made the following distinction:

if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.[24]

Physical presence at the threshold of the residence, therefore, was critical to the *Randolph* decision and that decision strongly suggests that it should be to our own analysis. Such an inference is also consistent with the Court's declaration that *Matlock* continues as viable precedent.

The Court in *Randolph* also notes that the fine line drawn between the facts of Randolph and *Matlock* is justified "so long as there is no evidence that the police ... removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection...." [25] In *Matlock*, the police placed the suspect under arrest in a police

vehicle and thereby, as a practical matter, deprived him of the opportunity to object at the threshold. As the Court upheld the consent search in *Matlock*, it appears that the motive for removing a suspect from the scene of the search is key. We, interpret *Randolph*, consistent with *Matlock*, to say that removal of an accused from his threshold becomes problematic if the purpose of removing him was to deprive him of the opportunity to object to the search. If the purpose was to effect a lawful arrest, as in *Matlock*, the removal is justified and not a subterfuge to prevent an opportunity for an accused to exercise his Fourth Amendment rights.

In the instant case, we note that the appellant and his wife were not arrested but rather voluntarily drove themselves to CID in order to provide what they perceived as proof of his innocence. There is no evidence that CID agents purposefully drew the appellant away from his home in order to deny him the opportunity to object to a search at the threshold. CID had a legitimate investigatory interest in speaking with the appellant and his wife about the victim's allegations. We further note that the CID agents twice contacted the duty trial counsel to verify that they were proceeding in a lawful manner. Finally, we note that separating potential witnesses for questioning is a routine police practice. Having carefully reviewed the record, we find no evidence that the CID agents removed the appellant from his home or that they separated him from his wife at the CID office for an improper ulterior motive.

The appellant also asserts in his brief that Mrs. Weston was "unaware that her husband had refused consent" when she granted her consent to the search of her home. Appellant's Brief at 7. The implication of the appellant's argument is that CID's failure to inform his wife somehow rendered her consent involuntary. We disagree.

We determine voluntariness from all the circumstances.[26] Our superior court recently

**22.** *Id.* at 170, 94 S.Ct. 988.

**23.** *Randolph,* 547 U.S. at 121–22, 126 S.Ct. 1515.

**24.** *Id.* at 121, 126 S.Ct. 1515.

**25.** *Id.*

adopted the Air Force court's non-exhaustive list of factors with respect to voluntariness of consent which we have applied to the instant case.[27] Based on these factors, the voluntariness of Mrs. Weston's consent to the search seems clear. Mrs. Weston went to the police station in her own vehicle of her own free will for the expressed purpose of clearing her husband of what she apparently believed were unfounded charges arising from a misunderstanding. She was free to leave at any time. On her own initiative, she brought what she believed were relevant exculpatory electronic items from her home, which she presented to CID. She reviewed the PASS form and initialed it in 14 separate places indicating her understanding of the agent's request. After arriving at her home with CID agents, Mrs. Weston readily allowed agents to ask her children relevant questions. During the search, she provided a box to carry seized items from the house and during her initial telephone conversation with her attorney-friend; she stated that everything was alright. We find no evidence that she did not fully and completely understand what she was consenting to.

Separate from the voluntariness issue is the Fourth Amendment impact of the appellant's unambiguous refusal to consent to the search. In *Matlock*, the accused, arrested and placed in a police car, was never asked to consent to the search of his house. In *Illinois v. Rodriguez*[28], a woman with apparent authority admitted police to an apartment in which the sleeping suspect was never asked to consent. In each instance, the Court affirmed the police entry onto the premises and subsequent search notwithstanding the fact that law enforcement officers in each

instance *could have* asked the suspect for permission but elected not to do so.

It is important to note that the majority opinion in *Randolph* declared the continued viability of *Matlock* and *Rodriguez*. It is also important to observe that, unlike Randolph, the CID agents in the instant case were not faced with a "social custom dilemma, where two physically present co-tenants have contemporaneous competing interests and one consents to a search, while the other objects." [29] The social custom dilemma in *Randolph* arose from an open and very public verbal dispute between a husband and wife at the threshold of their home and in the presence of the police. This is a far different situation from the case at bar where the appellant and his wife were interviewed separately and did not engage in a public dispute on their doorstep.

The lack of an open and public dispute between the appellant and his wife significantly diminishes the social custom rationale articulated in *Randolph*. There is no widely-shared social expectation that a reasonable third party, invited into a home by one of the residents, would decline that invitation merely because he or she was aware that an absent co-tenant objected to their presence. While some reasonable people might think better of visiting a residence if they knew an absent co-tenant did not want them, other reasonable people would have no such qualms. Consequently, it cannot be said there exists a widely-shared social expectation that the reasonable invitee would not accept the invitation.[30] In this regard, we note that Justice Breyer in his concurrence expressly observed that the Court's opinion "does not apply where the objector is not

---

**26.** *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

**27.** *United States v. Wallace*, 66 M.J. 5, 11–12 (C.A.A.F.2008)("(1) the degree to which the suspect's liberty was restricted; (2) the presence of coercion or intimidation; (3) the suspect's awareness of his right to refuse based on inferences of the suspect's age, intelligence, and other factors; (4) the suspect's mental state at the time; (5) the suspect's consultation, or lack thereof, with counsel; and (6) the coercive effects of any prior violations of the suspect's rights.")

**28.** *Rodriguez*, 497 U.S. at 179, 110 S.Ct. 2793.

**29.** *United States v. Hudspeth*, 518 F.3d 954, 960, 2008 WL 637638 *6 (8th Cir.2008)(en banc).

**30.** In-laws disliked by their daughter's spouse could reasonably be expected not to enter their home over his express objection at the threshold notwithstanding his wife's invitation. The same in-laws, however, might reasonably enter the home in their son-in-law's absence if he was at work or otherwise not on hand to create an awkward scene.

present and objecting" and that "were the circumstances to change significantly, so should the result." [31] We conclude that the Court in *Randolph* was carefully carving out a narrow exception to the general rule of "assumed risk" in third-party consent cases stated in *Matlock.*

Our narrow interpretation of *Randolph* appears to be shared by our superior court as well as a majority of federal courts that have considered *Randolph* in a variety of factual scenarios.[32] We acknowledge, however, that only two of the federal circuit cases involved defendants who, like the appellant, actively objected to the search of their home. These circuit courts split on the issue.[33]

As the appellant was not present at the threshold of his home when he expressed his objection to the CID search, we find that there was no "social dilemma" and that he assumed the risk that his wife might for her own reasons permit such a search. We further find that the search was lawful based on Mrs. Weston's voluntary consent. Therefore, we hold that the military judge did not

abuse his discretion when he denied the appellant's suppression motion. We are cognizant that an objecting, non-present appellant is a case of first impression to our court and to a lesser degree within the federal circuits. Such a lack of clear precedent is not evident, however, with respect to inevitable discovery.

### Inevitable Discovery

■ Assuming *arguendo* that the search was illegal and that the exclusionary rule should apply, we agree with the military judge that the computer evidence seized would in any case be admissible under the inevitable discovery doctrine.[34] MILITARY RULE OF EVIDENCE 311(b)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.) codifies this exception, stating that evidence that was obtained as a result of an unlawful search or seizure may be used when the evidence would have been obtained even if such unlawful search or seizure had not been made.[35] When the Government establishes by a preponderance of the evidence that routine procedures of a law enforcement agency would inevitably find the same evidence, the rule of inevitable discovery applies even in

**31.** *Randolph,* 547 U.S. at 127, 126 S.Ct. 1515 (Breyer, J., concurring).

**32.** *Wallace,* 66 M.J. at 5 ("*Randolph* stands for the narrow proposition that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident" is valid). *See also United States v. Ayoub,* 498 F.3d 532, 541 (6th Cir.2007); *United States v. McKerrell,* 491 F.3d 1221, 1222 (10th Cir.2007), *cert denied,* —— U.S. ——, 127 S.Ct. 2958, 168 L.Ed.2d 279 (2007); *United States v. Wilburn,* 473 F.3d 742, 745 (7th Cir.2007), *cert denied,* —— U.S. ——, 128 S.Ct. 553, 169 L.Ed.2d 387 (2007); *United States v. DiModica,* 468 F.3d 495, 500 (7th Cir.2006); *United States v. McCurdy,* 480 F.Supp.2d 380, 390 (D.Me.2007); *Shelton v. United States,* 2007 WL 4097302, *7–8, 2007 U.S. Dist. LEXIS 85244, *23–24 (N.D.Miss. 2007); *United States v. Eastom,* 2007 WL 2693182, 2007 U.S. Dist. LEXIS 67899 (N.D.Okla.2007); *United States v. Janicek,* 2007 U.S. Dist. LEXIS 35740 (D.Neb.2007); *United States v. Battle,* 2006 U.S. Dist. LEXIS 31739 (D.Mass.2006); *United States v. Young,* 2006 U.S. Dist. LEXIS 28141 (N.D.W.Va.2006).

**33.** *United States v. Hudspeth,* 518 F.3d 954 (8th Cir.2008)(Defendant Hudspeth was arrested at work for, *inter alia,* possession of child pornography on his work computer. Information supplied by Hudspeth led officers to believe additional evidence was on his home computer.

Hudspeth was asked for permission to search his home computer. He refused. Hudspeth was transported to jail and officers approached his wife at home. She refused their request to search but agreed police could seize a computer used by her husband and herself. The trial and appellate courts upheld the validity of the seizure based on the wife's third-party consent notwithstanding the defendant's earlier express refusal to consent.); *United States v. Murphy,* 516 F.3d 1117 (9th Cir.2008)(Defendant Murphy was living in a storage unit rented by a third party (Roper) where Murphy manufactured methamphetamine. Officers approached the unit and when Murphy responded, officers observed a functioning methamphetamine lab inside the storage unit. Murphy was arrested but refused to give consent to a search of the storage unit. Roper later gave consent and evidence was seized. The trial court upheld the search but the 9th Circuit reversed holding that a warrantless entry and search is invalid when one occupant refuses permission to search even though another occupant with authority consents).

**34.** AE XXV at 11.

**35.** *Nix v. Williams,* 467 U.S. 431, 441, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). *See* MANUAL FOR COURTS-MARTIAL, UNITED STATES (2005 ed.), Drafters' Analysis of Mil. R. Evid. 311(b)(2) at A22–18. *See also United States v. Kozak,* 12 M.J. 389, 391– 94 (C.M.A.1982) and *Wallace,* 66 M.J. at 5.

the absence of a prior or parallel investigation.[36]

In determining whether the computer would "inevitably" have been properly seized, independent of an improper initial search or seizure, we consider the totality of the circumstances. The relevant facts are those that existed at the time of the initial search and seizure on 18 May 2004. On that day, the victim brought the "gutted" electric razor containing a micro-camera to Agent Grimes. Sgt E told him that she recognized the razor as belonging to the appellant because she had seen him bring it to the office several times. She also told Agent Grimes that the appellant had knowledge of computers and surveillance equipment. She knew this because the appellant had shown her surveillance equipment at his home.

Agent Stevenson was a civilian CID investigator who supervised Agent Grimes. Agent Grimes was her trainee and the "duty investigator" on 18 May 2004. Both were present at the CID office when the appellant and his wife arrived and were placed in separate interview rooms. Agent Stevenson interviewed both the appellant and his wife, and obtained Mrs. Weston's consent to a search of her home. At this point, Agent(s) Stevenson, Grimes, and Gasper went with Mrs. Weston to her home to conduct the consent search at issue in this case. Before entering the home, Agent Gasper contacted the trial counsel by phone to brief him. The attorney was readily available at that time and was again consulted by phone during the search. Agent Stevenson directed the search of the home and the seizure of the computer by Agent Gasper and she told the other agents when to "wrap everything up."[37] Notwithstanding Mrs. Weston's assertion to the contrary, the weight of the evidence indicates that the agents did not turn on the computer prior to or after seizing it, in part, because they were aware of the need for a separate search authorization to do so.

Agent Grimes' testimony reveals that he knew a warrant was required to examine the contents of the computer and that he knew the process for getting a warrant.[38] His testimony specifically revealed that he knew probable cause had to be established and he knew he had to coordinate through the staff judge advocate's (SJA) office to the commanding general (CG) or other authorizing official. He also knew where the CG's office was located.[39] It is clear that an established process for obtaining search authorizations existed at Marine Corps Base Hawaii and that this process was used by Agent Grimes to secure authorization to search the computer.

Under these facts, had Mrs. Weston not consented to the initial search, it is reasonable to conclude that Agent Stevenson would probably have maintained the temporary control she had over the suspect and his house and she would have expedited efforts to obtain a proper search authorization based on the existing probable cause. It would be wholly unreasonable to conclude that Agent Stevenson would have simply abandoned her efforts to find and secure the computer in the face of a lack of consent.[40] It is equally unreasonable to conclude that she would not have applied her superior knowledge and experience in using the existing and available resources, including the trial counsel, to quickly obtain a search authorization had that, in fact, been necessary.

The fact that, having secured the computer, Agent Stevenson elected to delegate responsibility to her trainee to obtain a warrant to search the contents of the seized computer

**36.** *United States v. Owens,* 51 M.J. 204, 211 (C.A.A.F.1999).

**37.** Record at 92–93.

**38.** *Id.* at 48–49.

**39.** *Id.* at 50.

**40.** *See Owens,* 51 M.J. at 211 (There is no reasonable likelihood that Officer Mills would have abandoned his efforts to search the automobile at that point. When the routine procedures of a law enforcement agency would inevitably find the same evidence, the rule of inevitable discovery applies even in the absence of a prior or parallel investigation). *See also United States v. Kennedy,* 61 F.3d 494 (6th Cir.1995); *United States v. Seals,* 987 F.2d 1102 (5th Cir.1993); *United States v. Perea,* 986 F.2d 633 (2d Cir. 1993). *But cf. United States v. Owens,* 782 F.2d 146, 152–53 (10th Cir.1986); *United States v. Satterfield,* 743 F.2d 827, 846 (11th Cir.1984).

is of little moment. Tasking a subordinate to obtain a search warrant when the computer evidence is already safe and secure in the CID evidence locker has far less urgency than the situation that would have existed had Mrs. Weston declined to consent to the initial search. Having found by a preponderance of the evidence that the Government would inevitably have obtained authorization to seize the appellant's computer in a timely manner, we further find that the military judge did not abuse his discretion in denying the appellant's suppression motion.

## Findings Instructions

■ The appellant also raises three assignments of error relating to the military judge's instructions on findings. Specifically, the appellant asserts that the military judge's instructions concerning the elements of the specification under Charge II (housebreaking) and Specifications 1 and 2 under Charge III (invasion of privacy) were incorrect.

At trial, the appellant failed to object to any of the military judge's instructions. Such failure to object constitutes waiver of the objection in the absence of plain error.[41] To establish plain error, the appellant must demonstrate that there was error, that the error was plain or obvious, and that the error materially prejudiced the appellant's substantial rights.[42] We review a military judge's instructions *de novo*.

The military judge correctly instructed the members of the elements of the charged offense of housebreaking.[43] The military judge then listed the elements of the underlying offense of invasion of privacy.[44] The military judge also instructed the members

that "as a matter of law" the offense charged is most closely analogous to the military offense of disorderly conduct. He then proceeded to give the members several definitions relating to disorderly conduct. He did not, however, give any of the elements of the latter offense.

Based on these facts, the appellant now argues that the military judge's use of the language "as a matter of law" virtually equated the elements of disorderly conduct with invasion of privacy and that "it is entirely possible" that the appellant was convicted for unlawfully entering the victims home to commit disorderly conduct which is a totally different offense. We disagree.

The appellant's argument ignores the military judge's clear instruction that the members could only convict the appellant if they found beyond a reasonable doubt that, *inter alia*, the appellant entered the house for the purpose of committing an invasion of privacy. Further the military judge gave only definitions relating to disorderly conduct and did not provide the members with the actual elements of that offense. Having carefully reviewed the record, we conclude that no reasonable member could have interpreted the military judge's instructions to permit a finding of guilty to housebreaking without finding that the appellant entered the victim's house with the intent to commit an invasion of privacy.[45] Even assuming, *arguendo*, that the military judge erred, we hold the appellant's assertion of prejudice to be speculative at best. We, therefore, find that the appellant has not met his burden to demonstrate plain error.[46]

**41.** *United States v. Brewer*, 61 M.J. 425, 430 (C.A.A.F.2005).

**42.** *Id.*

**43.** That, at the time and place alleged, the appellant (1) unlawfully entered Government housing assigned to the victim and that (2) the unlawful entry was made with the intent to commit therein the criminal offense of invasion of privacy. MCM, Part IV, ¶ 56; Record at 579.

**44.** (1) That, on or about April 2003 at the victim's home, the appellant wrongfully captured three images of private areas within the home of the victim; (2) that such actions were without the victim's consent; (3) that under the circum-

stances, the victim had a reasonable expectation of privacy within her home; and (4) that under the circumstances, the appellant's conduct was of a nature to bring discredit upon the armed forces. Record at 580.

**45.** *Brewer*, 61 M.J. at 430 (citation omitted).

**46.** The appellant's assignments of error III and IV raise substantially the same argument regarding Specifications 1 & 2 of Charge III (invasion of privacy). As with Charge II, we have carefully reviewed the record and conclude that no reasonable member could have confused what elements were necessary to find the appellant guilty of the charge and specifications. Even assum-

## Cruelty and Maltreatment

The appellant asserts that the members were not properly instructed on the maximum possible sentence under Charge III (invasion of privacy). In this instance, the appellant properly objected at trial. We review a military judge's instructions *de novo*.[47]

The appellant's offenses under Charge III (invasion of privacy) are not specifically listed in Part IV of the Manual for Courts–Martial. The maximum punishment for unlisted offenses is that which is provided in Part IV for the listed offenses to which the conduct was most "closely related." [48] During the pre-sentencing portion of the trial, the military judge determined that the most closely related offense to the conduct alleged under Charge III was cruelty and maltreatment of a subordinate.[49] The appellant argues that the military judge erred in that the offense of disorderly conduct was more closely related.[50]

In support of his assertion, the appellant relies upon two Army court cases. We do not find either of these cases persuasive as the victim in each instance was either a civilian or senior to the accused.[51] In the instant case, the victim worked directly for the appellant and had day to day contact with him. The direct senior subordinate relationship between the appellant and the victim is significant to our analysis. The appellant acknowledges that "undoubtedly she experienced mental pain and/or suffering." Appellant's Brief at 17. The appellant's activities constituted a form of sexual harassment which caused the victim mental pain and anguish and as such his offense is more closely related to maltreatment of a subordinate. That she didn't experience this suffering until after the appellant's activities were revealed is of little moment. We find, therefore, that this assignment of error is without merit.[52]

## Conclusion

The court's opinion issued on 25 September 2007 is hereby set aside. The findings and the approved sentence are affirmed.

Chief Judge RITTER, Senior Judge ROLPH, Senior Judge FELTHAM, Senior Judge WHITE, Judge O'TOOLE, Judge KELLY, Judge MITCHELL, Judge VINCENT, Judge STOLASZ, and Judge COUCH concur.

ing, *arguendo*, that the military judge erred, we hold the appellant's assertion of prejudice to be speculative at best. We, therefore, find that the appellant has not met his burden to demonstrate plain error.

47. *United States v. Miergrimado*, 66 M.J. 34 (C.A.A.F.2008)(citing *United States v. Schroder*, 65 M.J. 49, 54 (C.A.A.F.2007)).

48. R.C.M. 1003(c)(1)(B)(i).

49. MCM, Part IV, ¶ 17 (elements: (1) a certain person was subject to the orders of the accused; and (2) that the accused was cruel toward, or oppressed, or maltreated that person).

50. Cruelty and maltreatment carries a maximum punishment, *inter alia*, of a dishonorable discharge and confinement for a period of one year.

MCM, Part IV, ¶ 17(e). Disorderly conduct under such circumstances as to bring discredit upon the military service carries a maximum punishment, *inter alia*, of confinement for four months. No punitive discharge is authorized for this offense. MCM, Part IV, ¶ 73(e)(1)(a).

51. *United States v. Johnson*, 4 M.J. 770, 771 (A.C.M.R.1978)(accused concealed himself in the stall of a woman's restroom of the post exchange and surreptitiously watched a civilian woman use the toilet in an adjoining stall); *United States v. Foster*, 13 M.J. 789, 795–96 (A.C.M.R.1982)(E–2 convicted of looking into the windows of a base housing residence of an E–3, the E–3's wife and their children at 0400.)

52. In view of our other findings in this case, the appellant's remaining assignment of error arising from cumulative errors is without merit.